23 F.3d 404
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Curtis SATTERWHITE, Defendant-Appellant.
 No. 93-5387.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 9, 1994.
Decided April 4, 1994.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert R. Merhige, Jr., Senior District Judge. (CR-92-146)
 Steven D. Benjamin, Steven D. Benjamin & Associates, Richmond, VA, for appellant.
 Stephen Wiley Miller, Asst. U.S. Atty., Richmond, VA, for appellee.
 On Brief: Kenneth E. Melson, U.S. Atty., Richmond, VA, for appellee.
 E.D.Va.
 AFFIRMED.
 Before HAMILTON and WILLIAMS, Circuit Judges, and OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 On November 16, 1992, a federal grand jury sitting in the Eastern District of Virginia, returned a five count indictment against the appellant, Curtis Satterwhite, charging him with one count of possession with intent to distribute and distribution of fifty grams or more of cocaine base (crack), 21 U.S.C. 841(a)(1) (count one); one count of using a communication facility to further a drug transaction, 21 U.S.C. Sec. 843(b) (count two); and three counts of possession with intent to distribute and distribution of cocaine, 21 U.S.C. Sec. 841(a)(1) (counts three, four, and five). After a jury trial, Satterwhite was convicted on all counts. On May 4, 1993, the district court sentenced Satterwhite to 240 months' imprisonment. We now affirm.
 
 
 2
 * In January 1992, a federal and state joint task force composed of agents of the Drug Enforcement Administration and state narcotics detectives began an investigation into suspected drug activity in Richmond, Virginia. As part of their investigation, the joint task force utilized the assistance of Robert Taylor, a confidential informant.
 
 
 3
 Taylor arranged a series of drug transactions with Satterwhite, most of which were recorded. To establish his credibility, Taylor arranged a small drug transaction in which he purchased from Satterwhite 2.64 grams of cocaine. In light of the success of this transaction, the joint task force began attempts to learn the scope of Satterwhite's drug activities, which included whether he had access to crack.
 
 
 4
 On February 5, 1992, Taylor purchased from Satterwhite 11.35 grams of cocaine. On February 12, 1992, Taylor and Satterwhite spoke by telephone and in response to a request from Taylor for crack, Satterwhite responded: "Okay, I, I have to see can I get that for you...." (J.A. 191). During his next contact with Taylor (February 21), Satterwhite, in responding to Taylor's request for crack, stated: "I ain't gonna be able to help you. If I knew how to cook, we'd be all right. You know what I'm saying." (J.A. 199).[1] Later in the same conversation, after the topic of discussion had shifted from drug deals, Satterwhite raised the issue of crack again. Satterwhite told Taylor to call him the next day, adding "I'm saying (inaudible) go to some people and I might can get you what you want," (J.A. 203), referring to crack.
 
 
 5
 The next day Satterwhite and Taylor spoke again by telephone. During the conversation, Satterwhite indicated that he would attempt to obtain some crack from another individual: "I'm saying, if this other dude ain't got it, I ain't gonna be able to do it, you know what I'm saying?" (J.A. 210). Shortly after that, Satterwhite stated: "As soon as my man come back here, I'll see, you know what I'm saying. If he did it, you know what I'm saying. Can do something. If not, then I ain't gonna be able to do nothing. You know what I'm saying, with that shit. You know." (J.A. 211). Satterwhite then promised to "beep" Taylor if he located any crack. Id. Satterwhite also asked Taylor how much crack he wanted and explained that it would cost "a G," or $1,000 per ounce. (J.A. 212). Taylor ordered two ounces, to which Satterwhite responded "OK. Well if they got it, I might go ahead and just get it out of mine (inaudible) right back." Id. Satterwhite then made arrangements to call Taylor back in twenty minutes if he could locate the two ounces of crack. Satterwhite did not call Taylor back after this conversation.
 
 
 6
 On February 28, 1992, Satterwhite sold Taylor 58.94 grams of cocaine. Following this transaction, it was apparent to the joint task force that Satterwhite had no links to crack sources. As a result, the joint task force turned their attention to other drug dealers, intending no further transactions with Satterwhite.[2] In July 1992, however, Satterwhite approached Taylor and informed him that he "was doing rock cocaine now." (J.A. 79). This led to several contacts between Taylor and Satterwhite, resulting in a sale by Satterwhite to Taylor on August 14, 1992 of 124.2 grams of crack.[3]
 
 II
 
 7
 In the proceedings before the district court, Satterwhite argued that the government's efforts to purchase crack from him amounted to entrapment. The district court rejected Satterwhite's entrapment defense and refused to instruct the jury on the law of entrapment, concluding that Satterwhite had not met his burden of production on the issue. Satterwhite on appeal claims that he met his burden of production and, in fact, was entitled to a judgment of acquittal pursuant to Fed.R.Crim.P. 29 on counts one and two of the indictment because the government failed to present sufficient evidence from which the jury could conclude, beyond a reasonable doubt, that he was, among other things, predisposed to commit those crimes. At bottom, Satterwhite contends that the jury should have been instructed on and permitted to consider his entrapment defense. We disagree.
 
 
 8
 It is well settled that the government may not create the crimes it prosecutes by planting the idea of a crime in the mind of an innocent person and then inducing the commission of that crime. Once the government does offer a defendant an opportunity to commit a crime, it must be prepared to show, beyond a reasonable doubt, that the defendant was predisposed to commit the crime. See Jacobson v. United States, 112 S.Ct. 1535, 1540 (1992). Accordingly, the defense of entrapment, which is a "relatively limited defense," United States v. Wright, 921 F.2d 42, 44 (3d Cir.1990), cert. denied, 111 S.Ct. 2803 (1991), has two closely related elements, government inducement and lack of predisposition to commit the crime on the defendant's part. Mathews v. United States, 485 U.S. 58, 62-63 (1985). "The primary distinction between these elements is that inducement focuses on the government's conduct while predisposition focuses on a defendant's attitude or condition." United States v. Young, 954 F.2d 614, 616 (10th Cir.1992).
 
 
 9
 Governmental inducement "involves elements of governmental overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." United States v. Daniel, 3 F.3d 775, 778 (4th Cir.1993); see also Jacobson, 112 S.Ct. at 1540. Solicitation, which falls short of inducement, involves "the provision of an opportunity to commit a criminal act." Daniel, 3 F.3d at 778. A defendant's predisposition to commit a criminal act "refers to the defendant's state of mind before government agents make any suggestion that he shall commit a crime." United States v. Osborne, 935 F.2d 32, 37 (4th Cir.1991). In other words," predisposition is found from the defendant's ready response to the inducement offered." Id. at 38. Ultimately, in raising the affirmative defense of entrapment, the defendant must produce more than a scintilla of evidence that he was entrapped. Daniel, 3 F.3d at 778; United States v. Perl, 584 F.2d 1316, 1321 (4th Cir.1978), cert. denied, 439 U.S. 1130 (1979). Once the defendant has met his burden,"[t]he question of entrapment is generally one for the jury, rather than for the court." Mathews, 485 U.S. at 63.
 
 
 10
 Applying these principles, we believe the government's actions amounted to mere solicitation and that Satterwhite, once the criminal opportunity to sell crack came to fruition, was predisposed to commit the crime. In terms of inducement, the record is clear that Taylor did not have to "plead, argue or coerce a reluctant" Satterwhite into selling crack. Daniel, 3 F.3d at 779. Moreover, the evidence in the record does not point to any persuasion, fraudulent misrepresentation, threats, or promises of reward. The record simply reflects that Satterwhite's initial refusals to sell crack stemmed from his lack of a reliable crack source and lack of knowledge on how to "cook" crack, rather than the absence of a desire to sell crack. Accordingly, there was no governmental inducement. Our conclusion here is consistent with cases from our circuit in which we found no evidence of governmental inducement. See Osborne, 935 F.2d at 39; United States v. Hunt, 749 F.2d 1078, 1085-86 (4th Cir.1984), cert. denied, 472 U.S. 1018 (1985); United States v. De Vore, 423 F.2d 1069, 1071 (4th Cir.1970), cert. denied, 402 U.S. 950 (1971).
 
 
 11
 In terms of predisposition, Satterwhite, once the opportunity arose to sell crack, was ready to sell crack to Taylor if he could find a source or learn how to cook it. For example, during the February 12 telephone conversation, Satterwhite responded to Taylor's request for crack in the following manner: "I have to see can I get that for you...." (J.A. 191). During this conversation, Satterwhite did not indicate a refusal to sell crack. Moreover, on February 21, Satterwhite indicated a willingness to sell crack: "If I knew how to cook, we'd be all right. You know what I'm saying." (J.A. 199). The following day, Satterwhite told Taylor: "I'm saying, if this other dude ain't got it, I ain't gonna be able to do it, you know what I'm saying?" (J.A. 210). Shortly after that, Satterwhite stated: "As soon as my man come back here, I'll see, you know what I'm saying. If he did it, you know what I'm saying. Can do something. If not, then I ain't gonna be able to do nothing. You know what I'm saying, with that shit. You know." (J.A. 211). Thus, the record is patently clear that there is no evidence of a lack of predisposition on behalf of Satterwhite to sell crack. Osborne, 935 F.2d at 38.
 
 
 12
 In sum, the district court properly denied Satterwhite's Fed.R.Crim.P. 29 motion for judgment of acquittal and request for an entrapment instruction.
 
 III
 
 13
 Satterwhite also contends that the district court should have refused to impose the statutorily mandated minimum sentence of twenty years for repeat drug offenders and should have departed downward from that sentence because, according to Satterwhite, the government overcame his will to sell only powdered cocaine, and not its sister substance, crack. This argument, in essence, asserts that the government engaged in "sentence entrapment" and "sentence manipulation." See United States v. Jones, No. 93-5320 slip. op. 13-20 (4th Cir. March 2, 1994).
 
 
 14
 In Jones, we declined to embrace these theories as a basis for a downward departure, holding simply that if a basis for departure did exist under these theories it was inapplicable to the case. We reemphasize today that we do not embrace these theories and hold that even if they were to apply, they are inapplicable to this case.
 
 
 15
 The court in Jones noted that "sentence entrapment" and "sentence manipulation" are "related, but distinct, claims." Id. at 13. The Jones court further noted that an essential element of a claim of "sentence entrapment" is the lack of predisposition to commit the criminal act in question. Id. at 17. As discussed in Part II, there was no lack of predisposition on Satterwhite's part to engage in crack transactions. Therefore, even if "sentence entrapment" was a viable theory for a downward departure under the guidelines, Satterwhite's "sentence entrapment" argument must fail.
 
 
 16
 For "sentence manipulation" to apply, the government's conduct must be so outrageous that it offends due process. Id. at 15-17. In this case, the government's conduct was routine and certainly falls woefully far short of outrageous. Accordingly, Satterwhite's "sentence manipulation" argument also fails.
 
 IV
 
 17
 For the reasons stated herein, the judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 "Cooking" is the process of making crack from powdered cocaine
 
 
 [2]
 Satterwhite was not arrested at this time because to do so would have revealed Taylor's involvement as a cooperating individual and would have jeopardized his ongoing operations
 
 
 [3]
 On August 14, 1992, Taylor paged Satterwhite. During the ensuing phone conversation, the crack transaction was set up